## Case No. 4,914.

### FOOTE v. MT. PLEASANT.

[1 McCrary, 101.][1]

Circuit Court, D. Iowa. Oct., 1878.

[1] [Reported by Hon. Geo. W. McCrary, Circuit Judge, and here reprinted by permission.]

H. Scott Howell and J. G. Anderson, for plaintiff.

Woolson & Babb, for defendant.

DILLON, Circuit Judge. This is an action by Chas. B. Foote against the city of Mt. Pleasant, involving the validity of $50,000 of bonds issued by the defendant city to what was known as the Keokuk, Mt. Pleasant and Muscatine Railroad Company, and the right of the plaintiff to recover on these bonds. The defenses to the suit are four-fold: First. Denying that the plaintiff is the owner and holder of the coupons sued upon, or any part of the same, or that he has any interest therein. Second. That the bonds were issued without authority of law and are illegal and void. Third. That the bonds were issued upon the express condition that the proceeds should be used solely for work on the railroad to be done in Henry county, Iowa, and that the plaintiff had full knowledge of that fact; and that they were never so issued as to entitle the plaintiff to the rights of an innocent holder of the bonds or coupons for value; and if he ever held the same, he has parted with all interest therein. Fourth. That the said bonds and coupons have been fully settled and satisfied by the defendant city, and have been paid and cancelled.

The case is submitted on an agreed statement of facts, from which it appears briefly as follows: In 1857, under a provision in the charter of the city of Mt. Pleasant, the question was submitted to the legal voters, whether they would authorize a subscription by the city of Mt. Pleasant of $50,000 to the capital stock of the Keokuk, Mt. Pleasant and Muscatine Railroad Company. This submission was pursuant to section 28 of the charter, which is as follows: "The said city shall have power to subscribe to the capital stock in any railroad company, and may pay the same with the bonds of the city, and shall be empowered and required to levy and collect all the necessary taxes to pay the principle and interest on such bonds;

provided such subscription shall be authorized by a majority of the legal voters of said city cast at an election ordered for that purpose." At the time when this vote was taken, in August, 1857, the general law of the state had authorized counties, cities and incorporated towns to aid railroad companies by subscription to their stock, and to issue bonds. This act contained a provision as follows: "And the proceeds of such bonds shall in all cases be expended within the limits of the county in which the said city may be situated." In the proposition submitted to the voters was this provision: "Such bonds shall be issued only on the guaranty that the money shall be expended in the county of Henry, in the construction of said road." So that the general law of the state, and the specific submission to the voters, alike provided that the proceeds of the bonds were to be expended in the construction of the road in Henry county. That vote was taken in August, 1857, and it resulted in favor of the proposition. In November, 1857, the city council authorized the issue of the bonds of the city, pursuant to that vote, for the sum of $50,000, to aid this railroad company, on receiving the guaranty of the railroad company that they would expend the money (the proceeds of these bonds) in Henry county. The city accepted the unsecured obligation of the railroad company that they would do so. The city bonds were accordingly issued and delivered to the railroad company. In September, 1860, the railroad company resolved on the execution of a deed of trust or mortgage of the railway (a mortgage, in short, we may call it), on their entire line of road and property, present and future, to secure a large amount of bonds of two classes, one called the "First Mortgage Sinking Fund Bonds," and the other the "First Mortgage Bonds." The mortgage contained this provision, which it is important to notice, viz.: That in no case shall the bonds of the first class (that is, the first mortgage sinking fund bonds) be issued and disposed of except at the rate of $8,500 for every mile of road as completed, nor the bonds of the second class, except at the rate of $7,000 per mile of road as completed.

Now, the plaintiff's claim to the ownership of city bonds rests on two fundamental propositions. One is, that they were embraced in this mortgage. The other is, that being so embraced in the mortgage, they passed to him by virtue of the subsequent decree of foreclosure of the mortgage, and that he thereby has obtained title to them. This mortgage was made in 1860, and the language in respect to what it covers is in this wise: "Locomotives, tenders, rolling-stock, fuel, machinery," etc., and it proceeds thus: "and all other property, real and personal, and all rights and interests therein now owned or hereafter to be acquired by the said parties," etc.; and it concluded with

this reservation, among others: "and reserving also to the said railroad company full power to sell, convert and dispose of any city, county or other bonds or securities received in the payment of stock, or donated to the construction of the said railroad, and to collect subscription of stock: provided no default shall occur in the payment of interest on said bonds and to the sinking fund herein provided and required," etc. That mortgage was recorded, as it appears, only in the county of Lee, in the records of land mortgages. Afterwards the company went on and built eighteen miles of road in Lee county, and had completed only that amount of road at the time the war of the Rebellion broke out, at which time the company ceased its operations and became insolvent. The county of Henry had voted $100,000 of their bonds, concerning which the stipulation reads as follows: "Said company (the railroad company) has also received a subscription from Henry county of $100,000 in bonds, and it had agreed with Henry county to expend that amount in Henry county, which said bonds had been sold by the company." It is agreed that no road was ever built in Henry county; that only eighteen miles was completed in Lee county; and that the railroad company had done work in Henry county only to the amount of $34,000. In other words, very much less than the amount of work which they were required to do, in respect to the $100,000 of bonds which they had received from the county of Henry; so that we may say that no part of the $50,000 here in controversy was ever expended in Henry county, as required by the law of the state and by the specific vote that was taken. This $50,000 of bonds were delivered to the railroad company prior to the execution of the mortgage, and after the mortgage they were left in the possession of the railroad company, which afterwards delivered these bonds to Mr. J. Edgar Thompson, one of the trustees in the mortgage; but it is stipulated that Thompson received these bonds not in his capacity as trustee, but as a bailee of the railroad company; so that, in short, these bonds remained always with the railroad company, as well after the mortgage as before.

I have stated that the railroad ceased to do work and became insolvent in 1861, and this was the condition of affairs: The city had these bonds for $50,000 outstanding and in the hands of the railroad company; the company was insolvent, and all work had been suspended; there was no road completed in Henry county, and no prospect of any being completed. In 1862 the supreme court of the state of Iowa decided, in the case of State v. Wapello Co., 13 Iowa. 388, which was followed in the next year by the cases of Myers v. County of Johnston. 14 Iowa, 49; McMillan v. Boyles, Id. 107; Ten Eyck v. Mayor of Keokuk, 15 Iowa. 486; and Smith v. Henry Co., Id. 385,—that under the constitution of the state it was beyond legislative competency to authorize municipalities to aid railroad companies by subscription to their stock and the issuing of bonds, and that was accepted in the state of Iowa as the settled law on that subject. In 1865 the city of Mt. Pleasant instituted a suit in one of the local courts, making the railroad company, Mr. Foote, the plaintiff here, and others defendants, and praying that the bonds be ordered to be surrendered to the city and cancelled. That was in September, 1865. In October, 1865, a new element was introduced: A Mr. Lash, who had been vice president of the railroad company, went before the city council and made the proposition that if they would appoint him as agent, he would take up and procure to be surrendered to the city the $50,000 of bonds, which, with interest, then amounted to about $70,000; and they appointed him agent for that purpose. Here comes the controversy between Lash and the city, as to his relations to the city and to the railroad company, and the supreme court of the state decided that Lash was the agent of the city to procure these bonds. The city issued to Lash warrants to the amount of $6,000, with which he was to pay $1,000 of the old debts of the railroad company, and was to use the others in forwarding the affairs of the railroad company. The supreme court decided that Lash was the agent of the city to procure these bonds. He had procured them in October, 1865, and brought them into the city council and surrendered them, whereupon (and which is, I think, the most sensible thing I have seen in the whole controversy) some gentleman moved that having got the wolf they ought to kill him on the spot, and the council proceeded to burn the bonds.

In the following April, 1866, Mr Foote, the plaintiff in this suit, having and being the owner of 244 of the first mortgage sinking bonds, and 202 of the first mortgage bonds, which it is stipulated were issued as this road was built mile by mile for the eighteen miles completed in Lee county, brought his bill to foreclose this railway mortgage, making defendant to that bill, the trustees, Mr. Thompson and Mr. Hooper, and all the other bondholders; and such proceedings were had as that Foote obtained a decree in his favor for $318,000, in May, 1866, and the other bondholders for $38,000, and Edward Kilbourn, the lessee of the company, a decree for $364,000; and one question is, whether under that decree the bonds of the city are included in the property ordered to be sold. I will read the decree so far as it relates to the description of the property ordered to be sold: (The city of Mt. Pleasant, I may remark, was not a party to that foreclosure.) "The superstructure, iron rails, water tanks, rolling stock, fuel, material, track, and all franchises, rights and privileges, and all rights of way over lands belonging to the said

railroad company;" and the following clause is the one on which the plaintiff relies for title: "or in any of which things said railroad (or said railroad company) have any interest or claim, and in all other property of the said railroad company, whether real, personal or mixed, or in which they have any interest or claim, being as well for the payment of the bonds issued by the said railroad company, and the other claims against the said property." Under that decree there was a statutory appraisement of the specific property, locomotives, cars, etc., owned by the railroad company, amounting to $91,000, and an omnibus valuation of the railroad track, and all other property, real, personal and mixed, in which the company had any claim, amounting to $459,000. In other words, the bonds here in controversy, issued by the city of Mt. Pleasant, are not mentioned in terms as being conveyed by the mortgage, nor are they mentioned in the decree, or in the appraisement, or in the deed, but they are claimed to be covered by the general language, "any and all other property, real, personal or mixed, belonging to the corporation."

Now the question is whether on this state of facts, Mr. Foote has a claim to these bonds, as a bona fide holder thereof without notice of the rights and equities of the city. We are of opinion that he is not such a holder, for several reasons. In the first place, it would be very improbable that a railroad company, having received bonds issued by a municipality for the express purpose of sale and negotiation by it, to aid it in the construction of its road, would embrace those bonds in a railway mortgage, and thus sink that much of the ready means intended to enable them to build the road, by putting them in an omnibus mortgage of this kind. The most natural course would be that these bonds should be sold. They were made for that purpose—made to be negotiated in the usual way. There ought, therefore, to be very clear language to justify a court in holding that the railway company intended to include these bonds in a mortgage. The language here is general, and in one view it is broad enough to cover these bonds. In a more narrow view these bonds would not be held not to be embraced in it. What is best to guide the court as to the intention of the parties, for that should govern. To guide us, let us look at the practical construction the parties put upon this transaction. Now, if the bonds were intended to be included in the mortgage, it would seem to be very natural that they should be delivered to the trustee, but they were not. On the contrary, as I have stated, they always remained in the possession of the railroad company. Not only so, but the trustee, Mr. Thompson, an experienced business man, undoubtedly faithful to his trust, and, in 1865, when the president of the railroad company sent an order, on him, to surrender these bonds to the city, he set up no claim to them. He did not say that these bonds belonged to this trust property, but he surrendered them to the agent of the city, thereby recognizing the fact, as he understood it, that they were not embraced in the mortgage.

Then again, here is a property which at the time of this foreclosure amounted to seventy or seventy-five thousand dollars, and while the decree mentions everything else, down to "spikes," in infinite detail, these bonds are never mentioned anywhere in the proceedings.

But the plaintiff relies upon an implication arising out of the reservation in the deed of trust that the city might sell these bonds until default in the payment of interest. Now whatever effect that might have, one thing is manifest, namely, that it appears from that very reservation that there was no intention here to pass to the mortgagees, or to the trustee representing the bondholders in this mortgage, an absolute and full title to these bonds. That is not the negotiation of a security in a commercial sense, so as to cut off any equity, leaving it in the possession of the owner with power to sell; so that, in our judgment, Mr. Foote never obtained any title to these bonds in a commercial sense, so as to defeat defenses, even admitting the language of the mortgage is broad enough to embrace them. That is one ground on which we think the suit must fail, but there are others that seem to our mind equally conclusive.

We have already adverted to the fact that the statute required the proceeds of these bonds to be expended in the county of Henry, and not only so, but the specific proposition submitted to the people of the city of Mt. Pleasant was that these bonds should be thus expended; and the railroad company executed its obligation agreeing to thus expend them; so that we have the statute of the state, and the specific proposition voted on by the people of the city, and also the obligation of the railroad company, all concurring that the money arising from the sale of these bonds, "the proceeds of these bonds," in the language of the law, should be expended in Henry county. Now what does this contemplate? It contemplates the negotiation of these bonds in the ordinary and usual way, and the keeping of the proceeds separate from the other assets of the company, and that the proceeds when obtained shall be expended in the county of Henry. Fundamentally this was the inducement to make the vote. What did the railroad company do? They received these bonds (and on the plaintiff's theory, for I am now discussing it in the view that he may be right and that this broad language is sufficient to include these bonds in the mortgage), and commenced their work in Lee county. They make a mortgage, and include these city bonds in it to raise money in gross. If that

transaction can be sustained, then it is very evident you can never tell how much money was obtained specifically on these bonds. It is very evident that the mortgagee made no specific advance on the faith of this security; and therefore to allow a recovery here would be to subvert the law, and the obvious intention of the law, and the express contract of these parties. The utmost effect, it seems to us, that can be given, would be that the right of the mortgagees would be dependent on the railroad company getting a perfect and complete title to these bonds. If the railroad should expend any amount of money equal to this amount of bonds specifically in Henry county, perhaps there would then be an equity on their part to hold these bonds and recover on them; and if they, before that time, had pledged them to the mortgagees, when the railroad company's right became perfect, the pledge would enure to the benefit of the mortgagee. But in that view of it, the mortgagees have taken them subject to all the equities of the city and railroad company. It is obvious that the railroad company never obtained any rights to these bonds, because the money was never expended in the county of Henry, or any part of it.

But suppose we are mistaken in this view, there is another ground which seems to us equally fatal to plaintiff's right. The language of this decree, ordering the sale, is in presenti. It did not include these bonds, for the reason that at that time the bonds had been surrendered to the city, and were no longer in existence. They had been destroyed. It cannot be held, under a sweeping provision of the mortgage, mortgaging all property, real, personal and mixed, not in possession, and thereafter to be acquired, that seven or eight years afterwards, when the railroad company has parted with a large amount of personal property under a jus disponendi reserved to it, that this decree in presenti, ordering the sale of all the personal property of the railroad, can relate back and divest titles acquired under the railroad company when they had the power of sale and disposition. Our judgment is, this decree is not broad enough to cover these bonds, they being no longer in existence at the time the decree passed, and it being known to the plaintiff that such was the fact; for Mr. Kilbourn concurred in the surrender of these city bonds, and he, as the agent of Foote, obtained a foreclosure, and knew that the bonds had been surrendered. He made no effort to impeach that transaction at the time of the foreclosure.

But suppose we are mistaken in this view, there is another equally fatal to the plaintiff's right, namely: That under the circumstances of this case, the surrender of these bonds is binding on all parties. How does the case stand? The city had made a subscription of $50,000 to this railroad in violation of the law of the state, as expounded by the supreme court of the state. The bonds had never been executed to the railroad. The city had subscribed to the stock in the books of the company, but the city still held the stock of the company. The company still held the bonds of the city, and the railroad company had become insolvent; had ceased to do any work. Seeing they were unable to carry out their contract to expend the proceeds of those bonds in the county, the city filed its bill to cancel this subscription and to have the bonds returned to it. It is plain that the city was entitled to have that done. Mr. Howell in his argument mistakes the decision of the supreme court of the United States. He says: "It is unnecessary to argue to this court that these subscriptions to railroad corporations are valid," etc. Such is not the effect of the decisions. The supreme court of the United States simply hold that since the supreme court of the state of Iowa had, in 4 G. Greene, decided that such bonds might be constitutionally issued while such decision remained in force, they would be sustained in the hands of bona fide holders, but as to bonds issued, after that decision was overruled, the supreme court of the United States will accept the decision of the supreme court of the state on that subject. Now, there were no bona fide holders of these bonds at the time the surrender was made. The railroad company was not such. The city held the stock, and the supreme court of the state meanwhile had decided such bonds to be unconstitutional, and it is stipulated that these bonds were considered to be valueless. Under those circumstances, the transaction whereby the bonds were surrendered was valid. There can be no doubt about that. It is a misconception to suppose that the supreme court of the United States hold that the railroad subscription, as a subscription, is valid, contrary to adjudication of the state supreme court. All it holds is that commercial securities in the hands of bona fide holders must be protected. Hence the argument here made by Mr. Howell, that the surrender of the stock was a fraud upon the company's creditors, has no application. The city's liability as a stockholder could not be enforced. That is not a commercial security. Here is the decision of the supreme court of the state that the city had no right to become a stockholder, and the obligation of a stockholder cannot be enforced against it. So I say, it is clear that the surrender of these bonds was effectual and binding upon the city and the railroad company. The result is, that upon all these grounds Mr. Foote, as it appears to us, has no case. Judgment for defendant.